United States Court of Appeals,

Fifth Circuit.

No. 95-21020.

BELLAIRE GENERAL HOSPITAL, Plaintiff-Appellee,

v.

BLUE CROSS BLUE SHIELD OF MICHIGAN, Defendant-Appellant.

Oct. 23, 1996.

Appeal from the United States District Court for the Southern District of Texas.

Before DAVIS, JONES and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendant Blue Cross Blue Shield of Michigan appeals the district court's denial of its motion to dismiss for lack of personal jurisdiction and the district court's order that the parties submit their dispute to the court for resolution on a written record. Blue Cross also challenges the standard of review the district court applied to factual determinations made by Blue Cross. Finally, Blue Cross contests the district court's award of attorneys' fees to Plaintiff Bellaire General Hospital. We affirm in part and vacate in part, remanding for a proper determination of attorneys' fees.

I

Arlene White and Rebecca Catlin are Michigan residents and participants in health benefits plans underwritten by Blue Cross Blue Shield of Michigan, a nonprofit corporation operating exclusively within the State of Michigan. White was admitted to Bellaire General Hospital in Bellaire, Texas for depression and suicidal thoughts, and received in-patient hospital care from March 11 to April 9, 1993. Catlin was also admitted to Bellaire for depression and suicidal thoughts; she received in-patient hospital care from May 8 to June 10, 1993.

Both women assigned their insurance claims to Bellaire. Bellaire submitted the claims to Blue Cross for payment. In evaluating Bellaire's claim regarding White's medical treatment, a Blue Cross registered nurse reviewed White's medical records, initially deciding to deny the claim entirely for lack

1

of medical necessity for in-patient treatment. Because Blue Cross's initial determination was a complete denial of coverage, the claim was automatically submitted to Blue Cross's appeals committee, which approved coverage for seven days of in-patient hospital care for White. The committee denied coverage for the remainder of White's in-patient care. After White's treating physician requested second-level appeal, Blue Cross submitted the claim to an independent company, Peer Review Analysis of Massachusetts. Peer Review confirmed Blue Cross's decision to approve coverage for seven days of care and to deny coverage for the remainder of White's hospital stay. Thus, Blue Cross denied payment for Bellaire's claim regarding White's hospital care beyond seven days.

Similarly, after Bellaire submitted a claim to Blue Cross for Catlin's in-patient treatment, a Blue Cross registered nurse reviewed Catlin's medical records, also initially deciding to deny the claim entirely for lack of medical necessity for in-patient treatment. Again, the initial claim denial was sent automatically to Blue Cross's appeals committee which approved three days of ter Blue Cross submitted Catlin's claim to Peer Review for second-level appeal, Peer Review concluded that Catlin's condition did not warrant in-patient hospital treatment at all. However, Blue Cross denied payment for Bellaire's claim regarding Catlin's treatment beyond three days.

Subsequent to Blue Cross's denial of the claims, Bellaire filed suit against Blue Cross in the Southern District of Texas, alleging that Blue Cross had breached its insurance contracts with White and Catlin, or, in the alternative, that Blue Cross had violated ERISA, 29 U.S.C. § 1001 *et seq.* Blue Cross filed a motion to dismiss Bellaire's complaint for lack of personal jurisdiction; the district court denied the motion without explanation. After ordering the parties to submit their dispute to the court for resolution on a written record, the district court determined that Blue Cross had improperly denied Bellaire's claims. The court awarded Bellaire $68,764 on its insurance claims and $7,500 in attorneys' fees. Blue Cross appeals.

II

A

2

Blue Cross appeals the district court's denial of its motion to dismiss for lack of personal jurisdiction. Blue Cross argues that the district court lacked personal jurisdiction over it because Blue Cross is a nonprofit corporation operating exclusively within the State of Michigan. When, as here, "the [alleged jurisdictional] facts are not in dispute, we review *de novo* a district court's determination that its exercise of personal jurisdiction over a nonresident defendant is proper." *Wilson v. Belin,* 20 F.3d 644, 647-48 (5th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994).

ERISA, 29 U.S.C. § 1132(e)(2), provides for nationwide service of process. Specifically, § 1132(e)(2) directs that "[w]here an action under this subsection is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district court where a defendant resides or may be found."

We have previously addressed nationwide service of process provisions in federal statutes. In *Busch v. Buchman, Buchman & O'Brien, Law Firm,* 11 F.3d 1255 (5th Cir.1994), we analyzed the nationwide service of process provision contained in § 78aa of the 1934 Securities Exchange Act.[1] Concluding that service of process and personal jurisdiction are conceptually related concepts, we determined that when a federal court attempts "to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Id.* at 1258. We

---

[1]Section 78aa provides:

> The district courts of the United States ... shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violations occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found....

15 U.S.C. § 78aa (West Supp.1993).

specified that in such a case the relevant sovereign is the United States, and held that the due process concerns of the Fifth Amendment are satisfied and traditional notions of fair play and substantial justice are not offended where a court exercises personal jurisdiction over a defendant residing within the United States. *Id.*

The nationwide service of process provision in the statute at issue here, § 1132(e)(2) of ERISA, mirrors the provision we considered in *Busch.* Though the statutes obviously address different legislative subjects, we placed no limitation on our conclusion in *Busch* regarding personal jurisdiction in cases involving federal statutes providing for nationwide service of process. Rather, we stated:

> And, when a federal court is attempting to exercise
>
> personal jurisdiction over a defendant in a suit based upon a *federal statute* providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States.

*Busch,* 11 F.3d at 1258 (emphasis added). As a result, we find that the instant case falls squarely within our *Busch* holding, and hold that the district court properly exercised personal jurisdiction over Blue Cross based on its contacts with the United States.[2]

---

[2]Blue Cross argues that in the event we find that *Busch* controls the determination of personal jurisdiction in this case, we must find that the district court lacked subject matter jurisdiction over this case. Blue Cross asserts that *Busch* necessitates such a finding because in *Busch,* we interpreted § 78aa of the 1934 Securities Exchange Act to grant subject matter jurisdiction to a district court where " "any act or transaction constituting the violation occurred.' " *Busch,* 11 F.3d at 1256-57 (quoting 15 U.S.C. § 78aa (West Supp.1993)). Thus, Blue Cross contends, we must construe § 1132(e)(2) to grant subject matter jurisdiction in the same manner.

We reject this argument. Section 1132(e)(1) of ERISA specifically states that "the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter." Section 1132(e)(1) includes an exception for, *inter alia,* actions such as this one brought by a participant or beneficiary "to recover benefits due him under the terms of his plan...." The statute provides that "[s]tate courts of competent jurisdiction and district courts of the United States have concurrent jurisdiction" over this type of action. Nowhere in *Busch* do we direct that our finding regarding subject matter jurisdiction under § 78aa of the 1934 Securities Exchange Act extends to any statute other than the one before us in that case.

4

Although we dutifully apply *Busch*,[3] we emphasize our disagreement with it to the extent it concludes that the proper personal jurisdiction test in a national service of process case is whether minimum contacts exist between the individual and the national sovereign. *See id.* We view personal jurisdiction and service of process as conceptually distinct issues. We fail to apprehend how personal jurisdiction can be separated from due process by Congressional enactment of nationwide service of process provisions. *See Busch,* 11 F.3d at 1259 (Garza, J., dissenting) ("Because the personal jurisdiction requirement is a function of the individual liberty interest, the proper focus for a personal jurisdiction test should be on protecting an individual's liberty interest in avoiding the burdens of litigating in a distant or inconvenient forum. Requiring that the individual defendant in a national service of process case only reside somewhere in the United States does not protect this interest."); *see also Willingway Hosp., Inc. v. Blue Cross & Blue Shield of Ohio,* 870 F.Supp. 1102, 1106 (S.D.Ga.1994) ("To allow Congress to dictate personal jurisdiction through the enactment of nationwide service of process provisions, unquestioned by the judiciary is nonsensical.... To say that due process has no place in a personal jurisdiction inquiry seems contrary to the whole concept of due process."). It is far from clear to us that Blue Cross, a corporation operating exclusively within the State of Michigan, had sufficient contacts with the State of Texas to permit the district court to exercise personal jurisdiction over it under the traditional personal jurisdiction analysis, i.e., whether the defendant has had minimum contacts with the forum and whether maintenance of the action in the forum will offend traditional notions of fair play and substantial justice. *See International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) ("[D]ue process requires only that in order to subjepersonam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.") (citation omitted). Thus, though we follow

---

[3]*See Campbell v. Sonat Offshore Drilling, Inc.,* 979 F.2d 1115, 1121 n. 8 (5th Cir.1992) ("It has been long established that a legally indistinguishable decision of this court must be followed by other panels of this court and district courts unless overruled en banc or by the United States Supreme Court."), *reh'g denied,* 986 F.2d 1420 (5th Cir.1993).

*Busch* today and find that the district court properly exercised personal jurisdiction over Blue Cross in this case, we do so with grave misgivings regarding the authority upon which we rely.

B

Blue Cross contends that the district court violated FED.R.CIV.P. 43(a) when it ordered the parties to submit their dispute to the court for resolution on a written record.[4]  Blue Cross argues that the district court's order improperly precluded Blue Cross from performing cross-examination and redirect examination, and prevented the trier of fact from evaluating witness credibility.  We review *de novo* questions of law such as a district court's interpretation of the Federal Rules of Civil Procedure.  *Odom v. Frank,* 3 F.3d 839, 843 (5th Cir.1993).

We have not generally addressed whether Rule 43(a) prohibits a district court from requiring parties to submit their disputes for resolution on a written record, and those courts that have addressed this issue have reached different conclusions.  Some non-ERISA cases emphasize the importance of oral testimony to the trier of fact's ability to evaluate the credibility and demeanor of witnesses.[5]  None of these cases, however, is an ERISA "records" case, i.e., a suit such as this one in which a district court reviews an administrative decision for an abuse of discretion.  In such a case,

---

[4]Rule 43(a) provides:  "In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an Act of Congress or by these rules, the Federal Rules of Evidence, or other rules adopted by the Supreme Court."

[5]*See e.g., Adair v. Sunwest Bank,* 965 F.2d 777, 779-80 (9th Cir.1992) (per curiam) (holding that bankruptcy court's standard procedure requiring that direct testimony be presented by written declaration, followed by oral testimony on cross-examination and on redirect, did not violate Rule 43(a) because procedure "permits oral cross-examination and redirect examination in open court and thereby preserves an opportunity for the judge to evaluate the declarant's demeanor and credibility."); *In re Burg,* 103 B.R. 222, 225 (9th Cir. BAP1989) (holding that bankruptcy court's trial procedure violated Rule 43(a) by requiring direct testimony through submission of declarations rather than through oral testimony because "basic notions of procedural due process" dictate "that essential rights of the parties may be jeopardized by a procedure where the oral presentation of evidence is not allowed, where the bankruptcy court's ability to gage [sic] the credibility of a witness or evidence is questionable and where rulings on objections to the admissibility of all direct evidence, may be unclear."); *United States v. American Telephone & Telegraph Co.,* 83 F.R.D. 323, 339-40 (D.D.C.1979) (holding that order directing all witnesses' direct testimony to be presented in writing, with oral testimony on cross-examination only, would violate Rule 43(a) because, *inter alia,* oral testimony is essential to evaluation of witness demeanor and credibility)

the district court, in evaluating whether a plan administrator abused his discretion in making a factual determination, may consider only the evidence that was available to the plan administrator. *Southern Farm Bureau Life Ins. Co. v. Moore,* 993 F.2d 98, 102 (5th Cir.1993).[6]  Indeed, under *Moore,* because the district court was bound to the administrative record, the parties in this case could not have supplemented that record with additional oral testimony.[7]  Therefore, the district court did not err when it required the parties to submit their dispute for resolution on a written record.[8]

---

[6]In *Wildbur v. ARCO Chem. Co.,* 974 F.2d 631, 639 (5th Cir.1992), *reh'g denied,* 979 F.2d 1013 (5th Cir.1992), *appeal after remand,* 35 F.3d 560 (5th Cir.1994), we held that a district court is not confined to the administrative record in determining whether a plan administrator abused his discretion in making a benefit determination.  In *Moore,* however, we specified that *Wildbur* "dealt with an administrator's interpretation of plan terms reviewed under an abuse of discretion standard, not with factual determinations."  993 F.2d at 102.  We emphasized that "the court in *Wildbur* made clear that "district courts should evaluate the administrator's fact findings regarding the eligibility of a claimant based on the evidence before the administrator....' "  *Id.* (quoting *Wildbur,* 974 F.2d at 639).  Thus, in *Moore* we concluded that "we may consider only the evidence that was available to the plan administrator in evaluating whether he abused his discretion in making the factual determination[s] ... but we may consider other evidence, which was unavailable to the plan administrator as it relates to his interpretation of the policy."  *Id.*

> Here, Blue Cross admits that the decisions made by its plan administrators were factual determinations rather than policy interpretations.  As a result, under *Moore,* in evaluating whether Blue Cross's plan administrator abused its discretion in denying Bellaire's claims, the district court could consider only the evidence that was available to the plan administrator.

[7]Blue Cross contends that the district court erroneously considered evidence that was not part of the administrative record, in contravention of *Moore.*  Specifically, Blue Cross argues that as part of the written record Bellaire submitted to the court, Bellaire submitted an expert report from Dr. Susan Backes, White's treating physician, that was not in the administrative record because it was written after Blue Cross's second-level appeal decision.

> The facts upon which the district court relied in its order were generated at the time of White's in-patient treatment at Bellaire and were contained in the administrative record.  As a result, we reject Blue Cross's argument that the district court improperly considered evidence unavailable to the plan administrator at the time he made his factual determinations.

[8]Though we have not previously addressed the precise issue presented in this appeal, we have determined that a court must hold an oral hearing on a civil contempt motion.  In *Sanders v. Monsanto Co.,* 574 F.2d 198 (5th Cir.1978), we rejected the argument that FED.R.CIV.P. 43(e), which specifically authorizes district courts to hear motions without oral testimony, governs civil contempt motions.  We found that because a civil contempt action "is more in the nature of a trial on the merits," Rule 43(a) controls it.  We stated:

> A contempt proceeding from a court order is highly factual, approximating a trial

C

Blue Cross next contends that the district court applied an improper standard of review to the factual determinations made by Blue Cross. A district court should review factual determinations made by an ERISA plan administrator for an abuse of discretion. *Pierre v. Connecticut Gen. Life Ins. Co.,* 932 F.2d 1552, 1562 (5th Cir.), *cert. denied,* 502 U.S. 973, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991).

Blue Cross concedes that its decisions regarding the medical necessity of the in-patient hospital case received by White and Catlin were factual determinations subject to abuse of discretion review by the district court under *Pierre.*[9] Blue Cross argues, however, that despite the district court's statement at the outset of its order that it would review Blue Cross's decisions for an abuse of discretion, it actually reviewed Blue Cross's decisions under the more stringent *de novo* standard.

As noted, the district court specifically set forth the proper standard of review at the beginning

on the merits. Therefore, evidence ought to be presented in the method most consistent with arriving at the truth. Historical experience has taught us that testimonial evidence has the highest reliability because the credibility of the witnesses can be evaluated, and the factual issues narrowed by cross-examination. Because the contempt proceedings depend so heavily on complex facts not readily perceivable from the record, an oral hearing within the scope of Rule 43(a) is necessary.

*Id.* at 199-200.

Our concerns in *Sanders,* however, are not present in this case. *Moore* bound the district court to consider only the evidence that was available to the plan administrator; the parties could not enhance the administrative record with oral testimony. As a result, witness credibility was not relevant to the district court's decision in this case.

[9]Bellaire argues that the district court should have reviewed Blue Cross's claims decisions *de novo,* alleging that Blue Cross had a conflict of interest as a result of an economic interest in denying Bellaire's claims. A conflict of interest does not affect the standard of review, but rather is a factor to be considered in evaluating whether the plan administrator abused his discretion. *See, e.g., Sweatman v. Commercial Union Ins. Co.,* 39 F.3d 594, 599 (5th Cir.1994) ("[A] conflict of interest does not change the standard of review.... Instead, the district court should weigh any potential conflict of interest in its determination of whether the plan administrator abused its discretion.") (citations omitted); *Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011, 1014 (5th Cir.1992) ("[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.") (citation omitted).

8

of its order. The order states:

2. *Standard of Review*

Judicial review is limited to determining whether there is substantial evidence in the record to support Blue Cross' decision that in-patient case was medically unnecessary or whether its refusal to pay the submitted claims was arbitrary. *Duhon v. Texaco, Inc.,* 15 F.3d 1302, 1306 (5th Cir.1994). An arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence.

The district court then made detailed factual findings based on the written evidence submitted by the parties, and concluded that Blue Cross had improperly denied Bellaire's claims. Blue Cross's dissatisfaction with the district court's findings and conclusion does not demonstrate that the court applied a standard of review different from that expressly stated in its order.

We have interpreted Blue Cross's argument on appeal to be the legal argument that the district court failed to apply the appropriate abuse of discretion standard of review to the benefits decisions made by Blue Cross. Blue Cross's argument, however, can also be construed as a challenge to the district court's ultimate holding that Blue Cross abused its discretion in denying Bellaire's claims. We review *de novo* the district court's holding on the question of whether a plan administrator abused its discretion or properly denied a claim for benefits. *Sweatman v. Commercial Union Ins. Co.,* 39 F.3d 594, 601 (5th Cir.1994). However, we will set aside the district court's factual findings underlying its review of the plan administrator's determination only if clearly erroneous. *Id.* Thus, under *Pierre,* we must determine whether Blue Cross's decisions amounted to an abuse of its discretion. *Id.* at 601; *see also Pierre,* 932 F.2d at 1562 ("[F]ederal courts owe due deference to an administrator's factual conclusions that reflect a reasonable and impartial judgment."). In applying the abuse of discretion standard, we analyze whether the plan administrator acted arbitrarily or capriciously. *Sweatman,* 39 F.3d at 601.

White's contract provides for "[u]p to 30 days" of in-patient care for treatment of "nervous and mental conditions," and Catlin's contract provides for "[u]p to 45 days" of in-patient care for

9

treatment of "nervous and mental conditions."[10]  Both contracts state that "[a] service must be

medically necessary in order to be covered."  The contracts define "medical necessity" as:

Medical necessity for payment of hospital services includes *all* of the following:

The covered service is for the treatment, diagnosis or symptoms of an injury, condition or disease.

The service, treatment or supply is *appropriate* for the symptoms and is consistent with the diagnosis.

*Appropriate* means that the type, level and length of care, treatment or supply and setting are needed to provide safe and adequate care and treatment.

For inpatient hospital stays, acute care as an inpatient must be necessitated by the patient's condition because safe and adequate care cannot be received as an outpatient or in a less intensified medical setting.

The services are not mainly for the convenience of the member or health care provider.

The treatment is not generally regarded as experimental or investigational by BCBSM.

The treatment is not determined to be medically inappropriate by the Utilization Management and Quality Assessment Programs.

In the section of the contracts entitled "Hospital Services Which are Payable," the contracts state:

In order for covered services to be payable, they must be *medically necessary.*  (See the definition of "Medically Necessary" in Section 2, "The Language of Health Care.")

*Note:*  Medically necessary services which can be provided safely in an outpatient or office location are not payable when provided on an inpatient basis.

Blue Cross denied Bellaire's claims after determining that White and Catlin's in-patient care was not

medically necessary.

Blue Cross provides its reviewers with a manual entitled "Criteria for Review of Adult

Inpatient Psychiatric Services."  The manual is "intended to aid the reviewer in the process of

determining whether valid medical need existed for the inpatient provision of psychiatric care and

---

[10]The district court stated that the Blue Cross contract "provides in-patient hospital care for beneficiaries who suffer from nervous and mental disorders for up to thirty days."  Though Catlin's Blue Cross contract does contain this provision, it also contains a rider that specifies coverage of up to forty-five days for in-patient hospital treatment for nervous and mental disorders.

whether the care is in accord with accepted standards of medical practice." The manual lists examples of "fairly specific and definable patterns of impaired behavior about which there is consensus that the hospital is the most appropriate setting for treatment." These criteria include: a person who is actively suicidal or demonstrates a strong potential for suicide; a person who is actively self-mutilative; and a person who has demonstrated "an inability to tolerate or respond to a good faith effort at aggressive outpatient and/or partial hospitalization treatment, and there is a reasonable hope that inpatient therapy will significantly improve the patient's condition."

In its order, the district court discussed these provisions of the insurance contracts and detailed the above-described justifications for in-patient treatment of mental disorders. It also made factual findings that White had attempted suicide in the past; that she had suicidal "ideations, delusions, and hallucinations" which persisted during her in-patient treatment at Bellaire; that she heard voices and believed herself to be possessed by a demon; that her condition deteriorated during out-patient therapy; and that her physician believed she demonstrated a strong potential for suicide. The district court also found that Catlin was admitted to Bellaire after her second suicide attempt in thirty days; that she had suffered two recent drug overdoses; that out-patient therapy had not helped her; that she attempted to harm herself during her hospital stay by scratching her wrists; and that her physician b required to stabilize her condition. The district court then concluded that Bellaire had "sufficiently supported its claim that in-patient hospital care was necessary for both patients."

Blue Cross argues that the district court improperly supplanted its judgment in place of Blue Cross's reasonable claims decisions. To support this contention, Blue Cross asserts that it conducted a reasonable investigation before denying Bellaire's claims, and contends that ample evidence supported its conclusion that in-patient treatment for White and Catlin was not medically necessary. Specifically, Blue Cross notes that both White and Catlin traveled without assistance from Michigan to Bellaire Hospital in Houston; that both women completed and signed admission and consent forms at Bellaire; that Bellaire placed neither woman on "suicide precautions;" that Bellaire removed both

11

women from "close observation" within forty-eight hours of arrival;[11] that neither woman was "self-mutilative;"[12] that both women had only vague and nonspecific suicidal thoughts; and that neither woman posed a danger to herself, others or property.[13]

After conducting the second-level appeal of Bellaire's claims regarding White's treatment, Blue Cross notified Bellaire by letter that:

> Based on Severity of Illness and Intensity of Service Criteria, a total of 7 days have been approved; the remaining 22 of [sic] days are denied because Severity of Illness and Intensity of Service Criteria are not met and the inpatient setting is not justified.

Blue Cross sent Bellaire a similar letter regarding the outcome of the second-level review of Bellaire's claim regarding Catlin's treatment.

Blue Cross's "Criteria for Review of Adult Inpatient Psychiatric Services" manual states that "[t]he Severity of Illness/Intensity of Service Psychiatric Criteria [SI/IS], presented in Section II, should be the main guide to the auditor in determining the necessity of inpatient psychiatric care," and that "[a]s much as possible, the SI/IS criteria should be used as the standard for determining the medical necessity of inpatient care." The manual instructs that "[i]f, at the time of admission, and throughout the hospital stay, the medical record contains documentation that at least one SI criterion and at least one IS criterion are met, then the case should be approved."[14]

---

[11]White's physician placed White on "close observation" for suicidal behavior from March 18 to March 25. Catlin's physician placed her on "close observation" for self-abusive behavior for two days after she cut herself superficially with a razor. Thus, though the women may have been removed from "close observation" within forty-eight hours of admission, both were returned to that status for a period of time later in their hospital stays.

[12]As noted, Catlin's record reflects that on May 30, after approximately three weeks of treatment, she cut herself superficially with a razor.

[13]The admission forms of both women reflect that upon admission their physicians determined that they "posed an actual or imminent danger to self, others and/or property due to behavorial [sic] manifestations of a mental disorder."

[14]The SI criteria include:

> a. *Suicide attempt.*
>
> b. *Suicidal ideation (e.g., depression with feelings of suicidal hopelessness).*

c. *Self-mutilative behavior.*

d. Assaultive behavior.

e. Destructive behavior (to property).

f. Psychiatric symptoms (e.g., hallucinations, delusions, panic reaction, anxiety, agitation, depression) severe enough to cause disordered/bizarre behavior (e.g., catatonia, mania, incoherence, autism) or psychomotor retardation resulting in significant interference with activities of daily living.

g. Disorientation or memory impairment severe enough to endanger the welfare of self or others.

h. A severe eating disorder (i.e., anorexia and/or bulimia) refractory to a good faith effort at aggressive outpatient or partial hospitalization therapy.

i. Mental disorder refractory to a thoroughly documented, good faith effort at aggressive outpatient or partial hospitalization therapy (e.g., recurrent psychosis not responsive to outpatient treatment;  severe depression failing to respond to 21 days of outpatient drug therapy).

j. Seizures (toxic or withdrawal).

k. History of drug ingestion with suspicion of overdose.

....

The IS criteria include:

Treatments

a. Continuous observation and control of behavior to protect self, others and/or property (e.g., isolation, restraint, and other suicide/homicide precautions).

b. Need for close and continuous skilled medical observation due to side effects of psychotropic medications (e.g., hypotension, arrhythmia).

c. *Comprehensive multi-modal therapy plan requiring close medical supervision and coordination due to its complexity and/or the severity of the patient's signs and symptoms.*

NOTE:  *Except in unusual circumstances (e.g., patient flagrantly psychotic) the patient must see the psychiatrist in face-to-face therapy at least three times weekly.*  Care not meeting this requirement must be justified by documentation of a convincing rationale.

*Such a regimen must include some combination of several or all of the following:*

Milieu therapy;

The reports of the physicians who conducted the second-level appeals do not reflect application of the SI/IS criteria, despite Blue Cross's assertion that the SI/IS criteria dictated the claims denials. Rather, the reports summarize the patients' symptoms and treatment, and conclude that the in-patient treatment White and Catlin received was not warranted by their conditions.

Our review of the record indicates that White and Catlin's conditions and treatment met the criteria for necessary in-patient psychiatric care that Blue Cross asserted mandated denial of Bellaire's claims. White's medical record reflects that upon admission White's treating physician, Dr. Susan Backes, recorded White's "major presenting problems" as, *inter alia,* anorexia, hallucinations, delusions, and suicidal ideation.[15] Dr. Backes also noted that White had attempted suicide in the past.

> *Individual psychotherapy;*
>
> *Group therapy;*
>
> *Family therapy;*
>
> Behavior modification;
>
> Psychopharmacotherapy;
>
> *Occupational therapy;*
>
> *Recreational therapy;*
>
> Medical supervision; and
>
> Limited use of therapeutic passes.
>
> Medications
>
> d. IV or IM psychotropic medication (at least daily).
>
> e. Significant increases, decreases, or changes of psychotropic medication(s) requiring close and continuous skilled medical observation and supervision.
>
> ....

[15]Dr. Backes noted that upon admission White posed "an actual or imminent danger to self, others, and/or property due to behavorial [sic] manifestations of a mental disorder," and that "[d]ue to mental disorder," White was "impaired to the degree that [she] manifest[ed] major disability in social, familial, and/or occupational functioning." Dr. Backes also recorded "a verified failure of outpatient treatment," and observed that White could not "clinically be managed in a less intensive setting" and needed "the 24-hour structured therapeutic environment provided

14

White's record reflects that Dr. Backes observed suicidal ideation and delusional thoughts throughout White's hospital stay.[16] Furthermore, the physician who conducted White's "Utilization Management Physician Review" noted on both occasions[17] that White expressed suicidal ideation and delusional thoughts, and remained a risk of danger to herself outside the acute care setting. In addition, Dr. Backes placed White on "close observation" for suicidal behavior from March 18 to March 25. In sum, White's medical record contains documentation that White met at least two of Blue Cross's SI criteria at the time of admission and throughout the hospital stay, i.e., suicide attempt and suicidal ideation (e.g., depression with feelings of suicidal hopelessness).

White's medical record also contains documentation that she met one of Blue Cross's IS criteria at the time of admission and throughout her hospital stay. Specifically, White's medical record reflects that she attended daily face-to-face therapy sessions with a psychiatrist, in addition to attending group therapy and occupational therapy sessions throughout her hospitalization.

Catlin's medical record reflects that she was admitted to Bellaire after a recent suicide attempt, and that upon admission both Dr. Yusuf, the physician who conducted Catlin's preliminary mental status exam, and Dr. Orlando Peccora, Catlin's treating physician, noted suicidal ideation and depression.[18] Catlin's record also reflects that Dr. Peccora observed suicidal ideation throughout

---

by a hospital."

[16]Dr. Backes recorded observations of White's suicidal ideation and delusional thoughts from the time of her admission through April 5.

[17]White's record reflects that "Utilization Management Physician Review" was conducted on March 29 and April 5.

[18]Dr. Peccora recorded that upon admission Catlin posed "an actual or imminent danger to self, others and/or property due to behavorial [sic] manifestations of a mental disorder," that she needed "continuous skilled observation and evaluation available only in a hospital," and that "due to mental disorder, [Catlin was] impaired to the degree that [she] manifest[ed] major disability in social, familial, and/or occupational functioning." He also noted "a verified failure of outpatient treatment," and observed that Catlin could not "clinically be managed in a less intensive setting" and needed "the 24-hour structured therapeutic environment provided by a hospital."

Catlin's hospital stay.[19]  The physician who conducted Catlin's "Utilization Management Physician Review" noted weekly throughout her treatment that Catlin remained a risk of danger to herself outside the acute care setting.  As previously noted, during Catlin's treatment she cut herself superficially with a razor, and was placed on "close observation" for self-abusive behavior for two days.  Thus, Catlin's medical record contains documentation that Catlin met at least three of Blue Cross's SI criteria at the time of admission and throughout the hospital stay, i.e., suicide attempt, suicidal ideation (e.g., depression with feelings of suicidal hopelessness), and self-mutilative behavior.

Catlin's medical record also contains documentation that Catlin met one of Blue Cross's IS criteria at the time of admission and throughout her hospital stay.  Her record reflects that she attended daily face-to-face sessions with a psychiatrist, in addition to attending family therapy, group therapy, and recreational therapy sessions throughout her hospitalization.

Based on the foregoing, we find that the district court's factual findings are supported by the record, and thus are not clearly erroneous.  Though Bellaire's claims were reviewed at three stages, Blue Cross's evaluation reports do not reflect an analysis consistent with its own criteria.  Moreover, many of the facts that Blue Cross argues constitute "ample evidence" to support its claims decisions are contradicted by other facts in the record.  Thus, we agree with the district court and hold that Blue Cross acted arbitrarily in denying Bellaire's claims.  *See Sweatman,* 39 F.3d at 601 ("In applying the abuse of discretion standard, we analyze whether the plan administrator acted arbitrarily or capriciously.").

D

Blue Cross contests the district court's award of attorneys' fees to Bellaire.  We review the district court's award of attorneys' fees in an ERISA case under the abuse of discretion standard.  29 U.S.C. § 1132(g)(1);  *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448, 1458 (5th Cir.1995).

In *Todd,* after emphasizing that attorneys' fees awards under ERISA are purely discretionary,

---

[19]Dr. Peccora recorded observations of Catlin's suicidal ideation from the time of her admission through May 28.  Catlin's record reflects that on May 30 she cut herself superficially with a razor.

we discussed the analysis a district court awarding attorneys' fees under ERISA must undertake. We noted that we had previously "generally required" consideration of the five *Bowen* factors,[20] *id.* at 1458, and observed that we had previously "approved the use of the lodestar calculation in ERISA cases, even if it ha[d] not been explicitly required." *Id.* at 1459. We then stated:

> In an ERISA case, the determination of attorneys' fees *requires* the district court to apply a two-step analysis. The court *must* first determine whether the party is entitled to attorneys' fees by applying the five factors enumerated in *Bowen.* If the court concludes that the party is entitled to attorneys' fees, it *must* then apply the lodestar calculation to determine the amount to be awarded.

*Todd,* 47 F.3d at 1459 (emphasis added). We held that the district court in that case had "abused its discretion by failing to apply both the *Bowen* factors and the lodestar calculation." *Id.*

Bellaire argues that *Todd* does not require the district court to "espouse its analysis and reasoning regarding the propriety of an award of attorneys' fees," and that *Todd* "does not state ... that a district court's failure to set forth a "lodestar' calculation in awarding attorneys' fees is tantamount to an abuse of discretion." However, we stated:

> [W]e find that the district court abused its discretion by failing to apply both the *Bowen* factors and the lodestar calculation. Accordingly, we vacate the district court's order concerning attorneys' fees and remand for a proper determination of the amount, if any, to which appellee is entitled through the application of the two-step analysis articulated above.

*Id.* at 1459.

Here, Bellaire submitted an affidavit to the district court in which its counsel enumerated the tasks he had performed during prosecution of this case; he requested a fee award of $15,000. Blue Cross's counsel also submitted an affidavit to the district court in which he stated that Blue Cross had expended no more than $5,000 in defending Bellaire's suit. The district court awarded Bellaire $7,500 in attorneys' fees without explanation.

---

[20]The five *Bowen* factors are: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' position. *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980), *appeal after remand,* 695 F.2d 531 (11th Cir.1983).

The record contains no discussion of the two-step analysis necessary for an award of attorneys' fees in an ERISA case, or any explanation at all of how the district court arrived at the fee award. As a result, we vacate the court's judgment regarding the amount of attorneys' fees, and remand for recalculation.

## III

For the foregoing reasons, we AFFIRM in part, VACATE in part, and REMAND for a proper determination of attorneys' fees.

.  .  .  .  .