IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-20645
_____

VILMA LISSETTE VEGA and
JOSE VEGA,

Plaintiffs-Appellants,

versus

NATIONAL LIFE INSURANCE
SERVICES, INC., ET AL.,

Defendants,

PAN-AMERICAN LIFE INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court for
the Southern District of Texas

_____

June 30, 1998

Before POLITZ, Chief Judge, REYNALDO G. GARZA and DENNIS, Circuit Judges.

POLITZ, Chief Judge:

Vilma Lissette Vega and her husband Jose Vega filed the instant action

against Pan-American Life Insurance Company after the insurer denied coverage

for surgical costs for Mrs. Vega. Finding and concluding that Pan-American acted

under a conflict of interest and after an inadequate investigation of material facts, we reverse the grant of summary judgment in favor of the insurer.

## BACKGROUND

Jose Vega owns and operates Corona Paint & Body, Inc. d/b/a/ Corona Paint and Body Shop, structured as a Subchapter S corporation under the Internal Revenue Code. In March of 1995 he applied for an employer-sponsored group medical plan with Pan-American, covering himself as an employee and his wife as a dependent.

In August of 1995 Mrs. Vega underwent surgery at Twelve Oaks Hospital in Houston. Pan-American, through its subsidiary National Insurance Services, Inc.,[1] refused coverage, claiming that the insurance application made false statements about Mrs. Vega's pre-existing medical condition, and it rescinded all coverage for her. The Vegas filed suit in state court alleging state law causes of action. Pan-American removed the action to federal court.

Each side sought summary judgment. The district court granted same to Pan-American after concluding that the Employee Retirement Income Security Act,

---

[1] The district court concluded that NIS was the agent for Pan-American. Neither side disputes this conclusion. For convenience, remaining references to "Pan-American" in this opinion refer to Pan-American and NIS collectively.

popularly known as "ERISA,"[2] applied and that Pan-American had not abused its discretion in denying the medical claim.

## ANALYSIS

Summary judgment is appropriate if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3] In determining whether a summary judgment motion properly was granted, we review the record, viewing all fact questions in a light most favorable to the nonmovant.[4] In our analysis we apply the same standard as that used by the trial court.[5]

A. *ERISA coverage*

The Vegas contend that the trial court erred in concluding that ERISA covers this dispute. Unless ERISA applies there is no preemption of the state law claims and this matter was not properly removed to federal court.[6] The preemption

---

[2] 29 U.S.C. §§ 1001-1461.

[3] Fed. R. Civ. P. 56(c).

[4] *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355 (5th Cir. 1988).

[5] *Melton v. Teachers Ins. & Annuity Ass'n of America*, 114 F.3d 557 (5th Cir. 1997).

[6] *See generally Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987).

provision, § 514(a),[7] is "construed extremely broadly."[8] State law claims are preempted if they "relate to" an ERISA plan.[9] A state cause of action relates to an ERISA plan whenever it has "a connection with or reference to such a plan."[10] A state law claim addressing the right to receive benefits under the terms of an ERISA plan necessarily relates to an ERISA plan.[11] The claims at bar are therefore subject to ERISA preemption if there exists a valid ERISA plan.

ERISA covers employee welfare benefits plans, defined to mean "any plan, fund or program . . . established or maintained by an employer . . . to the extent that such plan, fund or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . medical, surgical, or hospital care or benefits . . . ."[12]

---

[7] 29 U.S.C. § 1144(a).

[8] *Corcoran v. United Healthcare, Inc.*, 965 F.2d 1321, 1328 (5th Cir. 1992) (citation omitted).

[9] *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990); *Taylor*, 481 U.S. at 62.

[10] *Dowden v. Blue Cross & Blue Shield of Texas, Inc.*, 126 F.3d 641, 643 (5th Cir. 1997) (quoting *Corcoran*, 965 F.2d at 1329)).

[11] *Dowden*, 126 F.3d at 643.

[12] 29 U.S.C. § 1002(1).

The district court correctly ruled as a matter of law that an ERISA plan existed and that the claims were therefore governed by the federal statute.[13] "By its express terms, ERISA encompasses welfare plans provided through the purchase of insurance. Moreover, it is a common practice for employers to provide health care benefits to their employees through the purchase of a group health policy from a commercial insurance company."[14] An ERISA plan exists "if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits."[15] Pan-American issued a group health insurance policy and a document titled "Summary Plan Description Supplement and ERISA rights." These, together with the employee enrollment cards and application and subscription agreement, set out the essential elements of the plan. In the application, Jose Vega acknowledges that "this plan constitutes an employee welfare benefit plan" under

---

[13] The Vegas filed a conditional motion to amend their complaint to assert a claim under ERISA in the event the court denied their motion to remand. By denying the motion to remand and treating their claims under ERISA standards, the district court implicitly granted the motion to amend.

[14] *Memorial Hosp. System v. Northbrook Life Ins. Co.*, 904 F.2d 236, 240 (5th Cir. 1990) (citing 29 U.S.C. § 1002(1)).

[15] *Id.* (quoting *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir. 1982) (en banc). *Accord McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 236 (5th Cir. 1995).

ERISA. Plan participants and beneficiaries are identified in the enrollment cards. The application states that the plan applies to all full-time employees of Corona. The shop is a three-person shop and the other employee, Fidel Beltran, was enrolled in the plan. The policy and plan summary indicate that premiums are to be paid by the employer or the employee as determined by the employer. A company check for the first month's premiums was included with the application and monthly premium billings were sent to Corona. The policy sets out the covered medical benefits and the method of filing a claim.

In *Meredith v. Time Ins. Co.*,[16] we explained that an essential element of an ERISA employee welfare benefit plan is the "establishment or maintenance [of a plan] by an employer intending to benefit employees."[17] The Vegas point out that they are the sole owners of Corona Paint & Body Shop. This fact alone, however, does not negate the existence of an ERISA plan. In *Meredith*, we held that an insurance plan covering only a sole proprietor and her spouse was not an ERISA employee welfare benefit plan.[18] We relied therein on 29 C.F.R. § 2510.3-3 (1992). Under this regulation, an employee benefit plan does not include one in which no

---

[16] 980 F.2d 352 (5th Cir. 1993).

[17] *Meredith*, 980 F.2d at 355.

[18] *Id*. at 358.

employees are participants, and for purposes of this regulation, "[a]n individual and his or her spouse shall not be deemed to be employees with respect to a trade or business, whether incorporated or unincorporated, which is wholly owned by the individual or by the individual and his or her spouse."[19] As noted above, however, the instant plan involves at least one other employee.

The Vegas contend that Pan-American failed to establish compliance with various requirements of ERISA, including the requirement that the plan "be established and maintained pursuant to a written instrument."[20] Even if the Vegas are correct, the dispute is governed by ERISA provided an employee welfare plan exists, and without regard to whether other requirements imposed by ERISA on the employer and others are met. For example, we have held that "[a] formal document designated as 'the Plan' is not required to establish that an ERISA plan exists; otherwise, employers could avoid federal regulation merely by failing to memorialize their employee benefit programs in a separate document so designated."[21]

---

[19] *Id*. § 2510.3-3(c)(1).

[20] 29 U.S.C. § 1102(1).

[21] *Memorial Hosp. System*, 904 F.2d at 241.

B.    *Whether Summary Judgment Was Appropriate Under the Abuse of Discretion Standard*

Benefit determinations by ERISA plan administrators or fiduciaries are reviewed under a *de novo* standard, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[22]  Where the administrator has discretionary authority, we review determinations of eligibility for plan benefits under the abuse of discretion standard.[23]  The record abundantly establishes that Pan-American was the administrator and fiduciary with respect to paying insurance claims.  It had discretionary authority in deciding such claims, and accordingly the abuse of discretion standard applies.[24]

---

[22] *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[23] *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594 (5th Cir. 1994); *Pierre v. Connecticut General Life Ins. Co.*, 932 F.2d 1552 (5th Cir. 1991).

[24]  Although the plan summary identifies the employer as the plan administrator, and the application and subscription agreement states that Pan-American and NIS are not "deemed to be a 'named fiduciary' or 'Plan Administrator' as defined by ERISA," Pan-American was indisputably the plan administrator and fiduciary with respect to paying insurance claims.  Under the insurance policy, claims must be sent to Pan-American on proof of loss forms it provided.  Pan-American, not the employer, was responsible for paying such claims.  Pan-American was therefore the plan administrator with respect to insurance claims, because it was "the person specifically so designated by the terms of the instrument under which the plan is operated."  29 U.S.C. § 1002 16(A)(i).  Pan-

Under the abuse of discretion standard we will give due deference to an administrator's factual conclusions that reflect a reasonable and impartial judgment,[25] looking to see whether the plan administrator acted arbitrarily or capriciously."[26] We have stated that "[a]n arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence."[27]

Before reviewing the evidence, we note that this case presents the apparently not uncommon circumstance where the insurer, whose policy provides the ERISA plan benefits, is itself the administrator of the plan, and is authorized by the plan to decide coverage questions. When an insurer is vested with sole and complete discretion to decide whether it will pay a claim, it necessarily operates under a

---

American was also a fiduciary with respect to such claims if it "has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.* § 1002(21)(A)(iii). In fact Pan-American had complete discretionary authority to decide claims. The plan summary states that Pan-American "or its service agent will determine the right of any person to
a benefit in accordance with the master policy. . . . Any decision maker under the plan shall have complete discretion in making such determinations which includes plan coverage, claims payments or plan interpretation."

[25] *Pierre*, 932 F.2d at 1552.

[26] *Dowden*, 126 F.3d at 644; *Sweatman*, 39 F.3d at 601.

[27] *Dowden*, 126 F.3d at 644 (quoting *Bellaire Gen. Hospital v. Blue Cross Blue Shield of Michigan*, 97 F.3d 822, 828 (5th Cir. 1996)).

conflict of interest. The Supreme Court has made clear that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"[28] We repeatedly have stated that a conflict of interest does not alter the standard of review, but is a factor to be considered in deciding whether the plan administrator abused its discretion.[29] We adhere to our precedents and take this opportunity to underscore that when presented with such a conflict of interest the court must carefully consider the administrator's actions. A close examination of those actions is mandated.

Pan-American denied coverage because it concluded that Jose Vega had misrepresented his wife's medical condition on his enrollment card. Under the policy, application and subscription agreement, and enrollment card, material misstatements and omissions gave Pan-American the right to rescind coverage. On the enrollment card Vega answered "no" to questions asking whether he and his dependents within the last two years had been "disabled, had surgery and/or testing considered, recommended or performed," and whether he and his dependents had

---

[28] *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, cmt. d (1959)).

[29] *E.g. Bellaire General Hospital*, 97 F.3d at 828 n.9; *Sweatman*, 39 F.3d at 599; *Salley v. E.I. Dupont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir. 1992).

ever "been advised to have any diagnostic test, hospitalization or surgery which was not completed."

The enrollment card was prepared in March of 1995. Surgery was performed on Mrs. Vega in August of 1995. The surgery included a repair to the posterior wall of the vagina. Mrs. Vega was a regular patient of Dr. David Galvan. Pan-American obtained Dr. Galvan's medical records. His handwritten notes included an entry in October 1994 to "posterior repair."

Pan-American offered summary judgment evidence that under its underwriting guidelines it will not insure an applicant if surgery or hospitalization is contemplated or recommended. It claims that Dr. Galvan's notes unequivocally establish that Mrs. Vega had been advised about the need for surgery for posterior vaginal repair. Hospital records reflect that the surgeon who operated on Mrs. Vega, Dr. Fernando Bueso, performed a "uterine suspension" and a "Burch-bladder suspension and posterior repair." A Pan-American telephone log indicates that Pan-American contacted Dr. Galvan's office after the surgery and was told by a member of Dr. Galvan's staff that Mrs. Vega had called with a medical question which Dr. Galvan answered and that Dr. Galvan did not recall what prompted the conversation.

11

Pan-American submitted an affidavit from a medical advisor for NIS, Dr. Joseph S. Caradonna, who opined that "the surgical procedures performed by Fernando Bueso, M.D. on [Mrs.] Vega on August 4, 1995 were for the same medical condition for which she consulted David G. Galvan, M.D. on October 5, 1994." Pan-American also submitted the affidavit of a Pan-American vice president and actuary, stating that Mrs. Vega's consultation with Dr. Galvan "for posterior repair surgery constituted a material misrepresentation," and that Pan-American will ordinarily deny an application for insurance where the applicant's physician has recommended surgery within two years of the date of the application.

Insofar as the summary judgment record reflects, Pan-American never asked Mrs. Vega whether she thought the surgery was related to her consultation with Dr. Galvan, or whether it was the result of a condition that preexisted the insurance coverage. The Vegas submitted, however, the affidavits of Drs. Galvan and Bueso. Dr. Galvan states:

> I have reviewed the letter from National Insurance Services by which they tell Mrs. Vega they are rescinding her insurance coverage based on a supposed failure to disclose the recommendation of a surgical procedure. The falsehood is on the part of National Insurance Services and not on the part of Mrs. Vega. . . . The letter refusing insurance coverage to Mrs. Vega also refers to a "visit" on October 5, 1994 which claims that I "recommended a posterior repair." This is false. I never recommended a posterior repair to Ms. Vega. In fact, I did not even see her on October 5, 1994. If she had had any need for a

12

posterior repair at that time, it would have been noted upon my examination of her on September 29, 1994. The most that would be indicated by the October 5, 1994 entry is a telephone discussion in which the terms came up. If I had intended in my medical records to indicate the recommendation of a posterior repair, I would have in no uncertain terms written down that such a repair was indicated, that I recommended it being done, and a plan for having it done. Mrs. Vega was not told that she needed any surgical procedure, nor do my medical records reflect any such recommendation of a surgical procedure. If the insurance company had in good faith called me and asked about these entries in the medical records, I would have been glad to explain the entries to them at that time.

Dr. Bueso's affidavit states:

I have read the opinion of a Joseph S. Caradonna, who claims to be a medical doctor in which he states his opinion that "the surgical procedures performed by Fernando Bueso, M.D. on [Mrs.] Vega on August 4, 1995, were for the same medical condition for which she consulted David G. Galvan, M.D. on October 5, 1994." This is a lie. The procedure which I performed on Mrs. Vega was caused by a condition of no more than two weeks duration which occurred after she was moving heavy furniture. She suffered severe pelvic pain which was the precipitating event for the necessity of the procedures. The condition did not exist on October 5, 1994, and Dr. Galvan did not see her for such a condition on October 5, 1994. I saw Mrs. Vega at least two other times between October 1994 and August 1995. If she had such a condition at that time it would have been revealed during those visits. There was no such pre-existing condition. It is clear that my surgery was performed secondary to an acute organ prolapse. The condition that required the posterior repair and other procedures was of acute onset, i.e. it had just happened. . . . The cause of Mrs. Vega's condition requiring the surgery is eminently clear from my medical records, and would have been even clearer if any physician or insurance company officer had bothered to contact me and inquire about this. The statements of Dr. Caradonna to the contrary are false, irresponsible, and not supported by any information in my medical

13

records, nor supported by any examination or treatment of the patient as would be required by any self respecting physician.

The letter rescinding the coverage also refers to Dr. Ramon Pineda, another of Mrs. Vega's physicians. The letter states that "Dr. Pineda's records indicate that on May 10, 1995 Ms. Vega obtained a consultation complaining of galactorrhea and a cytology was recommended. . . . Underwriting Guidelines clearly state that the recommendation of a surgical procedure is not an acceptable medical risk for this product."

Dr. Pineda submitted an affidavit stating:

I have had the opportunity to review a letter from National Insurance Services in which they claim to totally withdraw the insurance coverage of [Mrs.] Vega for a supposed "recommendation of a surgical procedure" that was not revealed on her application for insurance. The two entries from records which they refer to as support for the failure to report the "recommendation of a surgical procedure" reflect either a woeful ignorance of medical terminology or a deliberate attempt to defraud Mrs. Vega. The letter from National Insurance Services refers to the May 10, 1995 visit with me in which Mrs. Vega discussed galactorrhea and the recommendation of a cytology. Galactorrhea, of course, is simply the continuation of the breast to discharge after breast feeding has ceased. No surgical procedure is contemplated in such a mere observation of an insignificant condition. A cytology is simply the microscopic examination of cells. It is by no means a recommendation for a surgical procedure. I cannot believe that any competent physician, nurse, technologist or any other health care provider would in good conscience try to label either of these observations as a recommendation for a surgical procedure.

14

The district court reasoned that it could not consider the doctors' affidavits submitted by the Vegas because it could only consider the evidence that was before the administrator. In *Bellaire General Hospital v. Blue Cross Blue Shield of Michigan*, we stated that "the district court, in evaluating whether a plan administrator abused his discretion in making a factual determination, may consider only the evidence that was available to the plan administrator."[30] We relied on *Southern Farm Bureau Life Insurance Co. v. Moore*, where we also held that the district court should only consider the evidence that was available to the plan administrator in evaluating whether the administrator abused its discretion in making a factual determination.[31]

The rubric of *Bellaire* and *Moore* is not absolute and must be applied in the context of the facts before the court. The court must pause, before limiting itself to the record before the administrator, to assure itself that the administrator conducted a reasonable, good faith investigation of the claim. That requirement must be cautiously and carefully imposed when the administrator has the inherent conflict of interest as exists in the case at bar. To hold otherwise would restrict the district court to reviewing only those materials before the administrator, even in

---

[30] 97 F.3d 822, 827 (5th Cir. 1996).

[31] 993 F.2d 98 (5th Cir. 1993).

15

cases where the administrator conducted an unreasonably lax, bad faith investigation of the facts. That we cannot countenance. In *Moore* we were satisfied that the insurer had "conducted a reasonable investigation."[32]

When the plan administrator is acting under an inherent conflict of interest, the duty to conduct a reasonable investigation includes a full and fair review of all pertinent information reasonably available to the administrator.[33] In this case, the duty to obtain reasonably available information decidedly included further inquiry as to what Dr. Galvan meant when writing the words "posterior repair" in Mrs. Vega's chart. Dr. Galvan's affidavit clearly reflects that no surgery was planned, indicated, or advised when he made the ambiguous notation. Pan-American did not act reasonably when it failed to secure meaningful information from Dr. Galvan before denying the claim and withdrawing coverage for Mrs. Vega.

---

[32] *Id*. at 104. *Cf. Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1978) (holding, in a maritime case, that defendant's investigation of plaintiff's claim "was impermissibly lax under any reasonable standard, rendering [defendant's] decision not to pay maintenance and cure beyond [plaintiff's] discharge from the hospital arbitrary and capricious.").

[33]*Cf.* **Grossmuller v. International Union**, 715 F.2d 853 (3rd Cir. 1983) (ERISA requires pension plan fiduciary to consider any and all pertinent information reasonably available to him).

16

We further hold that the district court should consider expert testimony not before the administrator where its review of the pertinent records would be particularly aided by such expert assistance. For example, in the case at bar, references to "uterine suspension," "Burch bladder suspension," and "posterior repair" are medical terms, and the district court may consider expert testimony about same not presented to the administrator. An appropriate review of the administrator's decision requires an understanding of these terms which is not provided by or included in the records before the administrator.

Viewing the evidence in the light most favorable to the Vegas, as we must in this summary judgment case, the record establishes that: (1) Pan-American, as both the insurer and the administrator, operated under an inherent conflict of interest in denying the claim; (2) the primary basis for denying coverage was a cryptic, handwritten reference to "posterior repair" in Dr. Galvan's notes of October 5, 1994; (3) Dr. Galvan attests that he did not examine Mrs. Vega on October 5, and did not recommend to her that she undergo a surgical procedure; (4) Dr. Galvan advises that if Pan-American "had in good faith called me and asked about these entries," he would have explained them; (5) there is no evidence in the record that Pan-American contacted Mrs. Vega to determine whether she believed the surgery performed on her had been recommended prior to her husband's

17

application for insurance coverage, or whether the surgery was for a condition which preexisted the insurance policy; (6) Pan-American did not contact the doctor who performed the surgery, Dr. Bueso, to determine whether the surgery was for a condition preexisting the insurance coverage; (7) Dr. Bueso attests that the condition requiring the surgery was of acute onset and did not exist at the time Dr. Galvan wrote "posterior repair" in his notes; (8) Dr. Bueso's affidavit, like Dr. Galvan's affidavit, seriously questions whether Pan-American conducted a good faith investigation, noting that "[t]he cause of Mrs. Vega's condition requiring the surgery is eminently clear from my medical records, and would have been even clearer if any physician or insurance company officer had bothered to contact me and inquire about this;" and (9) Dr. Pineda, whose records are referenced in the letter rescinding the coverage, also seriously questions whether Pan-American conducted a good faith investigation of the claim.

The record before us inexorably compels the conclusion that Pan-American abused its discretion in denying the claim for Mrs. Vega's surgery and in rescinding her medical coverage under the ERISA plan. Accordingly, the summary judgment in favor of Pan-American is REVERSED and the matter is REMANDED for further proceedings consistent herewith.