**Raja N. SALAMEH, M.D., Plaintiff,**

v.

**PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY, Defendant.**

**Civil Action No. H–96–2874.**

United States District Court, S.D. Texas.

Sept. 24, 1998.

Paul E. Nunu, Attorney at Law, Houston, TX, for plaintiff.

Marilyn Tanner Hebinck, Royston Rayzor Vickery & Williams, Houston, TX, for defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant Provident Life & Accident Insurance Company's ("Provident") Motion to Dismiss Plaintiff's State Law Claims and to Strike Plaintiff's Jury Demand due to ERISA Preemption (# 18) and Plaintiff's Demand for Jury Trial (# 6). Having reviewed the motions, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that the defendant's motion should be granted and the plaintiff's motion should be denied.

### I. *Background*

Plaintiff Dr. Raja N. Salameh ("Salameh") is a board certified urologist practicing in Pasadena, Texas. Prior to 1990, Salameh and Dr. Raul Garcia ("Garcia") were partners operating under the name Urology Associates, P.A. ("Urology Associates"). On July 1, 1990, Dr. Gary Hurwitz ("Hurwitz") joined their practice and, on July 1, 1993, became a one-third owner of Urology Associates.

Effective April 8, 1990, Salameh obtained a disability income insurance policy from Provident. On October 1, 1990, however, Salameh's individual disability policy became part of Urology Associates' risk group policy covering all three physicians—Salameh, Garcia, and Hurwitz. The creation of a risk group

was precipitated by Urology Associates' obtaining a Provident disability income policy for Hurwitz. The premium was reduced as a result, and the partnership began paying the premium for the entire group, rather than Salameh paying an individual premium.

On June 5, 1993, Salameh slipped and fell in the hallways of Southmore Medical Center Hospital. Salameh asserts that he "injured his neck, back, and body generally" in the fall, rendering him unable to perform the same "quantity and quality of surgeries" as he performed before the accident. He claims that, as a result of his injuries, he sustained a loss of earning capacity, which he contends will continue throughout the remainder of his life. Provident denied disability benefits to Salameh, maintaining that his fall did not result in an immediate loss of income and further disputing his claim for future loss of income. Salameh instituted this action in state court on August 1, 1996, asserting claims for disability benefits under the policy as well for damages arising from Provident's alleged violation of Articles 21.21 and 21.55 of the Texas Insurance Code. Provident timely removed the case to federal court on the basis of diversity of citizenship. Provident contends that Salameh's disability income policy is part of an ERISA Plan, preempting his state law claims and foreclosing the availability of a jury trial.

## II. *Analysis*

### A. *Existence of an ERISA Plan*

The Employee Retirement Security Act ("ERISA") applies to employee benefit plans "established by or maintained by an employer or employee organization" engaged in interstate commerce. *See Meredith v. Time Ins. Co.,* 980 F.2d 352, 354 (5th Cir. 1993) (citing 29 U.S.C. § 1003(a)). "In enacting ERISA, Congress designed a comprehensive system of regulating employee benefit plans in order 'to provide the maximum degree of protection to working men and women' whose employers provide benefits." *Madonia v. Blue Cross & Blue Shield of Va.,* 11 F.3d 444, 448 (4th Cir.1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994) (quoting S.Rep. No. 127, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4838, 4854). Two types of employee benefit plans are governed by

ERISA: "employee welfare benefit plans" and "employee pension benefit plans." *See Weaver v. Employers Underwriters, Inc.,* 13 F.3d 172, 175 (5th Cir.), *cert. denied,* 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 866 (1994) (citing 29 U.S.C. § 1002(3)). An "employee welfare benefit plan" is defined as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits ....

29 U.S.C. § 1002(1); *see California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 117 S.Ct. 832, 836 n. 2, 136 L.Ed.2d 791 (1997); *Peterson v. American Life & Health Ins. Co.,* 48 F.3d 404, 408 (9th Cir.), *cert. denied,* 516 U.S. 942, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995); *Madonia,* 11 F.3d at 446; *Meredith,* 980 F.2d at 354.

The Fifth Circuit has "devised a comprehensive test for determining whether a particular plan qualifies as an 'employee welfare benefit plan.'" *Id.* Under this test, a court must ascertain "whether a plan (1) exists; (2) falls within the safe-harbor provision established by the Department of Labor; and (3) satisfies the primary elements of an ERISA 'employee benefit plan'—establishment or maintenance by an employer intending to benefit employees." *Id.* "If any part of the inquiry is answered in the negative, the submission is not an ERISA plan." *Id.* "At the outset, any court confronted with the question 'whether a particular arrangement constitutes an employee welfare benefit plan under ERISA "must first satisfy itself that there is in fact a plan at all."'" *Id.* (citing *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.,* 957 F.2d 178, 183 (5th Cir.), *cert. denied,* 506 U.S. 861, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992)); *Madonia,* 11 F.3d at 446–47. "'In determining whether a plan

... [exists,] a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.'" *Meredith,* 980 F.2d at 355 (quoting *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982)); *accord Madonia,* 11 F.3d at 447.

In this case, upon analyzing the first prong, a reasonable person could ascertain that a plan exists. The evidence establishes that the provision of disability insurance to the physicians of Urology Associates was and is part of an overall design of employee benefits, which constitutes an ERISA plan. *See Peterson,* 48 F.3d at 407; *Bellisario v. Lone Star Life Ins.,* 871 F.Supp. 374, 378–79 (C.D.Cal.1994). It is well recognized that a disability plan funded through the purchase of insurance may be categorized as an "employee benefit plan." *See Gonzales v. Prudential Ins. Co. of Am.,* 901 F.2d 446, 452 (5th Cir.1990). The record reflects that, in addition to disability insurance, various benefits were provided by Urology Associates to its physicians and staff members. Rita Davis ("Davis"), the office manager of Urology Associates for more than six years, testified at deposition that it was her responsibility to write checks for payment of the physicians' disability insurance premiums. To her knowledge, no corresponding deduction was made from their compensation. Davis further testified that Urology Associates provided and paid the premiums on life insurance for its physicians and staff. She also acknowledged that group health insurance was provided for the physicians and that the premiums were paid by Urology Associates. In addition, the record reflects that the staff participated in a profit-sharing plan provided by the partnership, in which it annually contributed a percentage of their salaries to the plan. Finally, the federal income tax returns for Urology Associates from 1992 through 1996 indicate that it took annual deductions for "employee benefits" and "retirement benefits." Under these circumstances, it is apparent that a plan existed. *See Peterson,* 48 F.3d at 408; *Madonia,* 11 F.3d at 447.

Under the second prong of the analysis, if a plan meets all four criteria contained in 29 C.F.R. § 2510.3–1(j)(1)–(4), it falls within the safe-harbor provision promulgated by the Department of Labor and is exempt from ERISA's coverage. *See Meredith,* 980 F.2d at 355; *Gahn v. Allstate Life Ins. Co.,* 926 F.2d 1449, 1452 (5th Cir.1991). A plan falls within the exemption and is not an ERISA plan if: (1) the employer does not contribute to the plan; (2) participation is voluntary; (3) the employer's role is limited to collecting premiums and remitting them to the insurer; and (4) the employer receives no profit from the plan. *See* 29 C.F.R. § 2510.3–1(j)(1)–(4) (1992); *Meredith,* 980 F.2d at 355. The plan must satisfy all four criteria to be exempt. Here, Urology Associates paid the premiums for life insurance covering its physicians and staff as well as its physicians' medical, health, and disability insurance. Thus, because Urology Associates contributed to the plan, the safe-harbor provision does not apply, and the plan is not exempted from ERISA.

Finally, in analyzing the third prong, the court "look[s] to the two 'primary elements of an ERISA "employee welfare benefit plan" as defined by the statute: (1) whether an employer established or maintained the plan; and (2) whether the employer intended to provide benefits to its employees.'" *Id.* (citing *MDPhysicians & Assocs.,* 957 F.2d at 183). The court, however, "cannot answer either question without first considering the bounds of the terms 'employer' and 'employee'". *Id.* at 355–56 (citations omitted). "An essential element of an ERISA employee welfare benefit plan is the 'establishment or maintenance of a plan by an employer intending to benefit employees.'" *Vega v. National Life Ins. Servs., Inc.,* 145 F.3d 673, 676 (5th Cir.1998) (quoting *Meredith,* 980 F.2d at 355). "[A]n employee benefit plan necessarily must center on the existence of an employer and an employee." *Meredith,* 980 F.2d at 354. ERISA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 1002(6).

The regulations promulgated under ERISA provide that "the term 'employee benefit plan' shall not include any plan, ... under which *no employees* are *participants* covered under the plan, as defined in para-

graph (d) of this section." 29 C.F.R. § 2510.3–3(b) (emphasis added); *see Vega,* 145 F.3d at 676; *Peterson,* 48 F.3d at 407. Certain individuals are specifically excluded from "employee" status:

(1) An individual and his or her spouse shall not be deemed to be employees with respect to a trade or business, whether incorporated or unincorporated, which is wholly owned by the individual or by the individual and his or her spouse, and

(2) A partner in a partnership and his or her spouse shall not be deemed to be employees with respect to the partnership.

29 C.F.R. § 2510.3–3(c)(1),(2). Hence, a plan in which the only participants are the owners of a business or partners in a partnership does not constitute an ERISA employee benefit plan. *See Peterson,* 48 F.3d at 407; *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 264 (9th Cir.1991); *Robertson v. Alexander Grant & Co.,* 798 F.2d 868, 870 (5th Cir.1986), *cert. denied,* 479 U.S. 1089, 107 S.Ct. 1296, 94 L.Ed.2d 152 (1987).

A plan in which one or more common law employees, in addition to self-employed individuals, are participants, however, is covered by ERISA. *See Vega,* 145 F.3d at 676 (the involvement of at least one employee is sufficient to establish the existence of an ERISA plan); *Peterson,* 48 F.3d at 408 (coverage of even one non-owner employee at inception of plan is sufficient to bring a policy within ERISA's scope); *Madonia,* 11 F.3d at 448 (provision of health insurance to several employees as well as sole shareholder of professional corporation constituted ERISA plan); *Kennedy,* 952 F.2d at 264 (coverage of non-owner employee renders policy an ERISA plan). The regulations recognize this dichotomy:

For example, a so-called "Keogh" or "H.R. 10" plan under which only partners or only a sole proprietor are participants covered under the plan will not be covered under Title I. However, a Keogh plan under which one or more common law employees, in addition to the self-employed individuals, are participants covered under the plan, will be covered under Title I.

29 C.F.R. § 2510.3–3(b); *Robertson,* 798 F.2d at 870.

"[W]hether an individual is an employee or an independent contractor is a question of law involving the interpretation of ERISA." *Penn v. Howe–Baker Eng'rs, Inc.,* 898 F.2d 1096, 1101 (5th Cir.1990) (citing *Holt v. Winpisinger,* 811 F.2d 1532, 1536 (D.C.Cir.1987); *Short v. Central States, Southeast & Southwest Areas Pension Fund,* 729 F.2d 567, 571 (8th Cir.1984)). "Reaching a legal conclusion as to whether [an individual] was an employee or an independent contractor requires examining and weighing a number of factors." *Id.* As the Supreme Court recognized over twenty years ago:

there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in light of the pertinent common-law agency principles.

*NLRB v. United Ins. Co. of Am.,* 390 U.S. 254, 258, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968).

For purposes of ERISA, the federal common law of agency is applied to determine whether an individual is an employee or an independent contractor, rather than the law of a particular state. *See Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *Penn,* 898 F.2d at 1100–05. The Restatement lists ten factors helpful in differentiating between an employee and an independent contractor:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

RESTATEMENT (SECOND) OF AGENCY § 220(2) (1958); *see Linkous v. United States*, 142 F.3d 271, 276 (5th Cir.1998); *Penn*, 898 F.2d at 1102 (citing *Holt*, 811 F.2d at 1540–41 nn. 54–61). The *Penn* court, relying on *Holt*, "put special emphasis on the issue of control, determining that 'the right of one party to control not only the result to be achieved by the other, but also the means and manner of performing the task assigned, is the most critical factor in ascertaining whether an employment relationship exists.'" *Id.* (quoting *Holt*, 811 F.2d at 1539). "[I]f control were the only factor," however, "then no professional who exercises professional judgment could be considered a[n] ... employee ...." *Linkous*, 142 F.3d at 275–76. Therefore, in addition to control, the court must consider the other factors listed in the Restatement to differentiate between an employee and an independent contractor. *See id.* at 276.

In *Community For Creative Non–Violence v. Reid*, the Supreme Court offered an expansive list of criteria for determining whether a person being paid for work is an employee. *See* 490 U.S. 730, 750, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989); *Penn*, 898 F.2d at 1102. First noting the need to consider the employer's right to control the manner and means by which the work product is accomplished, the Court found the following additional factors to be relevant:

the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Reid*, 490 U.S. at 751–52, 109 S.Ct. 2166 (citations omitted); *Penn*, 898 F.2d at 1102–03. "No one of these factors is determinative," however. *Reid*, 490 U.S. at 752, 109 S.Ct. 2166. In 1992, the Supreme Court declared that the statutory definition of "employee" under ERISA is "completely circular and explains nothing," and announced "a common-law test for determining who qualifies as an 'employee' under ERISA ...." *Darden*, 503 U.S. 318, 323, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). The Court adopted the *Reid* factors and rejected the notion that the term "employee" is to be interpreted in the context of the particular federal statute at issue, refusing to find relevant a claimant's reasonable expectation of receiving ERISA benefits. *See id.* at 324–27, 112 S.Ct. 1344.

When the employment status of a physician is in dispute, the First Circuit has found it to be indicative of independent contractor status, if the physician:

(1) earned compensation on a per-patient basis, rather than a flat salary;

(2) received no fringe benefits of a type given to the principal's employees (*e.g.*, vacation or sick leave, pension benefits, tax withholding);

(3) personally owned, invested in, or paid for the medical equipment and supplies used to treat patients, or the facilities which formed the situs of that treatment, or personally hired and supervised her own administrative or subsidiary medical personnel;

(4) held and paid for her own medical malpractice insurance policy; or

(5) exercised final judgment as to the appropriate medical treatment to render to patients.

*Vargas v. Cummings*, 149 F.3d 29, 32 (1st Cir.1998) (citing *Nieves v. University of*

*Puerto Rico*, 7 F.3d 270, 279 (1st Cir.1993)). By contrast, the First Circuit found that it would be indicative of employee status if a health care provider:

    (1) received a flat salary regardless of the number of patients seen or procedures performed;

    (2) received vacation time, sick leave, and other customary fringe benefits;

    (3) used only the [employer's] facilities, equipment, supplies, and personnel in rendering services;

    (4) received protection against malpractice suits at the employer's expense; and

    (5) enjoyed relatively little autonomy in practice management.

*See id.* "No single factor possesses talismanic significance," and "a status determination in a particular case inevitably hinges on the totality of the circumstances." *Id.*

In this instance, the status of Urology Associates' disability policy under ERISA depends on whether Hurwitz was an employee or an independent contractor. Provident asserts that Hurwitz was an employee of Urology Associates from July 1990 to July 1993. Salameh, however, contends that Hurwitz was at no time an employee of Urology Associates, claiming instead that he was an independent contractor. Salameh bases his contention on references made in two paragraphs of an agreement between Hurwitz and Urology Associates dated June 12, 1990, which use the term "independent contractor" to characterize Hurwitz. The second and third paragraphs of the agreement state:

    The DOCTOR being willing to be employed by UROLOGY ASSOCIATES, and UROLOGY ASSOCIATES being willing to employ the DOCTOR in the capacity of an independent contractor, do hereby agree to the following terms and conditions:

### ARTICLE I

### EMPLOYMENT AND DUTIES

UROLOGY ASSOCIATES hereby employs the DOCTOR, and the DOCTOR accepts employment with UROLOGY ASSOCIATES in the capacity of an independent contractor, to render professional medical services as determined by UROL-OGY ASSOCIATES in the manner and to the extent permitted by the applicable cannons of the professional ethics which as from time to time may be amended.

Provident urges the court to look beyond the agreement's designation of Hurwitz as an independent contractor to ascertain whether he was, in fact, an employee or an independent contractor of Urology Associates. Indeed, declaring a worker to be an independent contractor in a hiring agreement is not determinative. *See Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1010–12 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998). "The employment status of an individual for the purposes of ERISA is not determined by the label used in the contract between the parties." *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1492 (11th Cir.1993). Here, additional provisions of the employment agreement undermine Urology Associates' contention that Hurwitz was an independent contractor.

Article I of the agreement, as well as specifying that Hurwitz's provision of medical services would be "as determined by UROLOGY ASSOCIATES," defines his duties in greater detail and indicates the extent of the partnership's right of control:

    The DOCTOR'S duties shall include but not be limited to keeping and maintaining appropriate records relating to all professional services rendered, and preparing in connection with such services all reports, claims, and correspondence necessary and appropriate in the circumstances. All records, reports, claims, and correspondence shall belong to and remain the property of UROLOGY ASSOCIATES.

    The DOCTOR shall use his best efforts to promote the professional practice of UROLOGY ASSOCIATES; and shall to a reasonable extent attend professional conventions, post-graduate seminars, and participate in professional societies; and shall do all things reasonably desirable to maintain and improve his professional skills.

    The DOCTOR's other duties shall be such as UROLOGY ASSOCIATES may from time to time reasonably direct, including "on duty" and "on call" assign-

ments at night and on Sundays and holidays rotated in a reasonable manner.

Furthermore, the agreement contemplates a long-term relationship between Urology Associates and Hurwitz, rather than merely a temporary arrangement, culminating after three years with his admission as a partner. Article II of the agreement, entitled "Compensation," details Hurwitz's compensation and benefits:

> In consideration of all services to be rendered by DOCTOR, UROLOGY ASSOCIATES shall pay to DOCTOR a sum equal to:
>
> 1) First Year— Base salary—$105,000 guaranteed. This will include health, disability, and malpractice insurances to be paid by UROLOGY ASSOCIATES.
> 2) Second Year— Base salary $120,000—guaranteed, plus all additional expenses paid by UROLOGY ASSOCIATES.
> 3) Third Year— Base salary $150,000—guaranteed, plus all additional expenses paid by UROLOGY ASSOCIATES.
> 4) Fourth Year— One–third (1/3) partnership interest in UROLOGY ASSOCIATES, no buy-in for partnership, with equal division of profits per three (3) partners.
> 5) UROLOGY ASSOCIATES buys country club membership and pays monthly dues. Consumption to be billed to DOCTOR.
> 6) Four weeks vacation plus Continuing Medical Education leave annually.
> 7) Annual allowance for book and CME travel not to exceed $5,000.00.
> 8) Base salary paid according to UROLOGY ASSOCIATES customary schedule.
> 9) The execution of a partnership agreement will be made after three (3) years.

In this instance, Hurwitz's guaranteed base salary, Urology Associates' provision of fringe benefits, its reimbursement of his expenses, and the availability of paid vacation weigh strongly in favor of employee status. *See, e.g., Vargas,* 149 F.3d at 32; *Gatewood v. Railroad Retirement Bd.,* 88 F.3d 886, 891 (10th Cir.1996); *Carter v. Helmsley–Spear, Inc.,* 71 F.3d 77, 86 (2d Cir.1995), *cert. denied,* 517 U.S. 1208, 116 S.Ct. 1824, 134 L.Ed.2d 930 (1996); *Weber v. Commissioner,* 60 F.3d 1104, 1114 (4th Cir.1995).

As set forth in Article III, entitled "Termination," the agreement was terminable upon five conditions, including Hurwitz's ceasing to be a licensed physician, his death, the parties' mutual agreement, "[w]henever the DOCTOR fails or refuses to faithfully comply with the duties of his employment and comply with the provisions of this Agreement,"

and "[w]henever the DOCTOR fails or refuses to comply with the reasonable policies, standards and regulations of UROLOGY ASSOCIATES which from time to time may be established and amended." Under the terms of Article VII, entitled "Covenant Not to Compete," Hurwitz was prohibited from competing with Urology Associates, directly or indirectly, within a five-mile geographic radius for one year following the agreement's termination.

Under Article IV of the agreement, entitled "Conditions During Employment," Hurwitz was required to "devote his full time and best efforts to the performance of his employment" and was prohibited from performing any professional services for others. The agreement explicitly provides that "all fees or other income attributable to his professional services during the term of this Agreement shall belong to UROLOGY ASSOCIATES." Hurwitz was not permitted to retain any records concerning his patients, as the agreement specifies that "[A]ll case records, case histories, x-rays, films, or personal and regular files concerning patients of UROLOGY ASSOCIATES or patients consulted, interview or treated and cared for by the DOCTOR shall belong to and remain the property of UROLOGY ASSOCIATES." Urology Associates determined the equipment and supplies it furnished to Hurwitz and was obligated only "to provide and maintain such facilities, equipment, and supplies as it deems necessary for the DOCTOR's performance of his professional duties." The fact that Hurwitz worked exclusively for Urology Associates, that any revenue generated by his practice of medicine belonged to the partnership, and that he provided none of the equipment or supplies he used is highly suggestive of employee status. *See Vargas,* 149 F.3d at 32; *Gatewood,* 88 F.3d at 891; *Daughtrey,* 3 F.3d at 1492.

In addition, in Article V, entitled "Indemnity and Malpractice Insurance," Urology Associates' obligation to provide medical malpractice insurance for Hurwitz is reiterated:

> UROLOGY ASSOCIATES shall furnish at it's [sic] expense medical malpractice insurance, insuring DOCTOR in the prac-

tice of medicine to UROLOGY ASSOCI-ATES within fourteen (14) days from the date of this contract. The amount of liability covered under malpractice insurance shall be at least ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) per occurrence and THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($300,000.00) per policy period. The "provision and payment of medical malpractice insurance coverage for ... physicians suggest[ ], unless competently rebutted, an employer-employee relationship." *Nieves*, 7 F.3d at 280; *see Vargas*, 149 F.3d at 32.

Moreover, according to the affidavit of John G. Thayer, a certified public accountant who prepared Urology Associates' tax returns for 1990, 1991, 1992, and 1993:

> Dr. Hurwitz did not receive a 1099 for his contract physician fees. Dr. Hurwitz did receive a W2 form for the years 1990 through 1993 and taxes were withheld from Dr. Hurwitz's compensation. Further, Urology Associates deducted Dr. Hurwitz's compensation as part of "salary and wages" on its federal income tax returns.

The manner in which the partnership treated Hurwitz for tax purposes by withholding payroll taxes from his compensation, deducting his salary on its federal income tax returns, and reporting his income to the Internal Revenue Service on Form W2 rather than on Form 1099 is strong evidence that he was an employee. *See Reid*, 490 U.S. at 753, 109 S.Ct. 2166; *EEOC v. North Knox Sch. Corp.*, 154 F.3d 744, 750–51, 1998 WL 568809 (7th Cir. Sept.8, 1998); *Vizcaino*, 120 F.3d at 1011; *Carter*, 71 F.3d at 86; *Eyerman v. Mary Kay Cosmetics*, 967 F.2d 213, 218 (6th Cir.1992). Hence, Urology Associates' own actions refute the notion that Hurwitz was an independent contractor.

Although the practice of medicine is unquestionably a distinct occupation and requires a high degree of skill, after considering the full range of relevant factors, it is apparent that Hurwitz was an employee of Urology Associates from July 1990 to July 1993, not an independent contractor. Urology Associates provided Hurwitz with office space, furnished him the necessary medical equipment and supplies, paid for his medical malpractice insurance, provided him with disability, life, and health insurance, and paid for his continuing education courses and related travel. It also compensated him through the payment of an annual salary that was not based on the number of patients treated or the amount of fees collected, paid his additional expenses, provided him with four weeks of paid vacation annually, purchased a country club membership for him and paid the monthly dues, withheld taxes from his pay, and deducted his compensation on its annual income tax returns. These are all strong indicia of the existence of an employment relationship rather than of independent contractor status. *See Vargas*, 149 F.3d at 32; *Carter*, 71 F.3d at 86. Moreover, when propounded an interrogatory during discovery asking, "On what date did Gary Hurwitz, M.D., become an employee of your Urology Associates, P.A.?", Salameh raised no objection to the characterization of Hurwitz as an employee and merely answered, "July 1, 1990." Hence, despite the label attached by the agreement, it is evident that Hurwitz was an employee of Urology Associates at the time Salameh's individual disability income policy was converted into a group policy covering all three physicians, and he continued in that capacity for three years, including the date on which Salameh sustained his fall.

Therefore, the inclusion of Hurwitz in Urology Associates' disability insurance group policy was sufficient to bring the policy within the scope of ERISA. As a consequence, Salameh's disability policy was part of an employee benefit plan covered by ERISA.

### B. *Standing To Sue Under ERISA*

Although Salameh's disability insurance policy was part of an ERISA plan, to pursue his claim for benefits under ERISA, he must have standing to sue. *See Engelhardt v. Paul Revere Life Ins. Co.*, 139 F.3d 1346, 1351 (11th Cir.1998). "ERISA confers standing upon 'participants' and 'beneficiaries' of an ERISA plan." *Madonia*, 11 F.3d at 446 (quoting 29 U.S.C. § 1132(a)(1)); *see Engelhardt*, 139 F.3d at 1351; *Peterson*, 48 F.3d at 408. "A 'participant' is 'any employee or

former employee of an employer.'" *Id.* (quoting 29 U.S.C. § 1002(7)). "A 'beneficiary' is 'a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder.'" *Engelhardt,* 139 F.3d at 1351 (quoting 29 U.S.C. § 1002(8)).

Although Salameh was a partner of Urology Associates at the time he was injured, this "does not preclude him from being a beneficiary under the ERISA plan." *See Engelhardt,* 139 F.3d at 1351 (shareholder of professional corporation qualified as beneficiary of ERISA plan); *Prudential Ins. Co. of Am. v. Doe,* 76 F.3d 206, 209 (8th Cir.1996) (controlling shareholder was a beneficiary under ERISA); *Robinson v. Linomaz,* 58 F.3d 365, 370 (8th Cir.1995) (sole shareholders of corporation were beneficiaries of ERISA plan); *Peterson,* 48 F.3d at 408 (partner in a business concern had standing to sue under ERISA as a beneficiary); *Harper v. American Chambers Life Ins. Co.,* 898 F.2d 1432, 1434 (9th Cir.1990) (partner and his spouse were ERISA beneficiaries entitled to sue in federal court to recover benefits). ERISA's anti-inurement provision, which states that "the assets of a plan shall never inure to the benefit of any employer," does not disqualify him from recovering benefits as a beneficiary under the plan. *See Engelhardt,* 139 F.3d at 1351 (quoting 29 U.S.C. § 1103(c)(1)). "ERISA's anti-inurement provision addresses plan assets—*i.e.,* 'assets accumulating in trust and pension funds'—and is designed to guard against "'such abuses as self-dealing, imprudent investing, and misappropriation of plan funds'" by plan administrators and employers." *Engelhardt,* 139 F.3d at 1351 (quoting *Doe,* 76 F.3d at 209 (quoting *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 15, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987))). Salameh's recovery of benefits would not be paid out of funds entrusted to Urology Associates by its employees, but rather, from the general funds of the insurer. Because these funds are not "plan assets," no danger of self-dealing or misappropriation arises, as Salameh's status as a partner of Urology Associates did not put him in a position to exercise control over Provident's funds.

Therefore, Salameh is a beneficiary within the meaning of 29 U.S.C. § 1002(8) and has standing to sue under ERISA. "To hold otherwise would create the anomaly of requiring some insureds to pursue benefit claims under state law while requiring others covered by the identical policy to proceed under ERISA." *Peterson,* 48 F.3d at 409; *Madonia,* 11 F.3d at 449. "Such a scenario would frustrate Congress's intent of achieving uniformity in the law governing employment benefits." *Peterson,* 48 F.3d at 409; *Madonia,* 11 F.3d at 449.

### C. *ERISA Preemption*

Although Salameh may pursue his claim for benefits under ERISA, the existence of a remedy under ERISA precludes him from seeking recovery under state law. The Supremacy Clause empowers Congress to enact laws that supersede state law by means of an express provision in a federal statute, by implication, or by creating a direct conflict between federal and state law. *See* U.S. CONST. art. VI; *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). "ERISA's express pre-emption clause states that the Act 'shall supersede any and all State laws insofar as they may now or hereafter relate to an employee benefit plan ....'" *Boggs v. Boggs,* 520 U.S. 833, 117 S.Ct. 1754, 1761, 138 L.Ed.2d 45 (1997) (quoting 29 U.S.C. § 1144(a)); *see Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Dowden v. Blue Cross & Blue Shield of Tex., Inc.,* 126 F.3d 641, 643 (5th Cir.1997); *Nickel v. Estate of Estes,* 122 F.3d 294, 297 (5th Cir.1997). "'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c).

Courts have noted that the ERISA preemption provision is "deliberately expansive," has a "broad scope," an "expansive sweep," and is "conspicuous for its breadth." *See Dillingham Constr.,* 117 S.Ct. at 837; *District of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125, 129, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992); *Morales v. Trans World Airlines,* 504 U.S. 374, 383–84, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *FMC*

*Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); *Pilot Life Ins. Co.*, 481 U.S. at 45–46, 107 S.Ct. 1549; *Dowden*, 126 F.3d at 643; *Nickel*, 122 F.3d at 297. Thus, the words "relate to" are construed in their broadest sense. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Vega*, 145 F.3d at 675; *E–Systems, Inc. v. Pogue*, 929 F.2d 1100, 1103 (5th Cir.), *cert. denied*, 502 U.S. 981, 112 S.Ct. 585, 116 L.Ed.2d 610 (1991). "[A] state law 'relates to' an employee benefit plan, and is pre-empted by ERISA, 'if it has a connection with, or reference to, such a plan.'" *Morales*, 504 U.S. at 384, 112 S.Ct. 2031 (quoting *Shaw*, 463 U.S. at 97, 103 S.Ct. 2890); *accord Travelers Ins. Co.*, 514 U.S. at 656, 115 S.Ct. 1671; *District of Columbia*, 506 U.S. at 129, 113 S.Ct. 580; *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); *Vega*, 145 F.3d at 675; *Dowden*, 126 F.3d at 643; *Kramer v. Smith Barney*, 80 F.3d 1080, 1083 (5th Cir.1996).

"This sweeping pre-emption of state law is consistent with Congress's decision to create a comprehensive, uniform federal scheme for the regulation of employee benefit plans." *Corcoran v. United Health-Care, Inc.*, 965 F.2d 1321, 1328 (5th Cir.), *cert. denied*, 506 U.S. 1033, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992). ERISA preemption is designed to protect plan participants by eliminating the threat of inconsistent state and local regulations and to standardize the laws to permit the nationally uniform administration of employee benefit plans. *See Ingersoll–Rand Co.*, 498 U.S. at 138, 111 S.Ct. 478; *Coyne*, 482 U.S. at 10–11, 107 S.Ct. 2211; *Texas Life, Accident, Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Entertainment Co.*, 105 F.3d 210, 217 (5th Cir.), *cert. dismissed*, —— U.S. ——, 117 S.Ct. 2501, 138 L.Ed.2d 1006 (1997); *Peckham v. Gem State Mutual*, 964 F.2d 1043, 1051 (10th Cir.1992). In enacting the preemption provision of ERISA, Congress sought to

> ensure that plans and plan sponsors would be subject to a uniform body of benefit law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government.

*Ingersoll–Rand Co.*, 498 U.S. at 139, 111 S.Ct. 478; *accord Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452 (4th Cir.1992). Therefore, ERISA may preempt a related state law even if the state law is not specifically intended to regulate ERISA-governed plans. *See Ingersoll–Rand Co.*, 498 U.S. at 139, 111 S.Ct. 478; *Nickel*, 122 F.3d at 297; *see also Boggs*, 117 S.Ct. at 1762; *First Nat'l Life Ins. Co. v. Sunshine–Jr. Food Stores, Inc.*, 960 F.2d 1546, 1549 (11th Cir.1992), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993).

"[W]here a claim relates to an employee benefit plan governed by ERISA and [is] 'based upon state law of general application and not a law regulating insurance,' the state law cause of action is preempted by ERISA." *Cypress Fairbanks Med. Ctr., Inc. v. Pan–American Life Ins. Co.*, 110 F.3d 280, 284 (5th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 167, 139 L.Ed.2d 110 (1997); *see Hermann Hosp. v. MEBA Med. & Benefits Plan* ("*Hermann I*"), 845 F.2d 1286, 1290 (5th Cir.1988). Preemption does not occur, however, "if the state law has only a tenuous, remote, or peripheral connection with covered plans, . . . as is the case with many laws of general applicability." *District of Columbia*, 506 U.S. at 130 n. 1, 113 S.Ct. 580 (citations and internal quotations omitted); *Operating Eng'rs Health & Welfare Trust Fund v. JWJ Contracting Co.*, 135 F.3d 671, 677 (9th Cir. 1998). In determining whether a law is preempted, courts look to the objectives of ERISA and the nature of the effect of state law on ERISA plans. *See Dillingham Constr.*, 117 S.Ct. at 838; *Travelers Ins. Co.*, 514 U.S. at 656, 115 S.Ct. 1671; *JWJ Contracting Co.*, 135 F.3d at 678.

"ERISA preempts a state law claim 'if (1) the state law claim addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claim directly affects the relationship between the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries.'" *Smith v. Texas Children's Hosp.*, 84 F.3d 152, 155 (5th Cir.1996) (quoting *Hubbard v. Blue Cross & Blue*

718

*Shield Ass'n,* 42 F.3d 942, 945 (5th Cir.), *cert. denied,* 515 U.S. 1122, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995)); *accord Cypress Fairbanks Med. Ctr.,* 110 F.3d at 283; *Hook v. Morrison Milling Co.,* 38 F.3d 776, 781 (5th Cir.1994). A suit by a participant or beneficiary to recover benefits from a covered plan falls directly within the civil enforcement provision of ERISA, which provides an exclusive federal cause of action for the resolution of such disputes. *See Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 62–63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (citing *Pilot Life Ins. Co.,* 481 U.S. at 56, 107 S.Ct. 1549). " 'It is clear that ERISA preempts a state law cause of action brought by an ERISA plan participant or beneficiary alleging improper processing of a claim for plan benefits.' " *Dowden,* 126 F.3d at 643 (quoting *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 245 (5th Cir.1990) (citing *Pilot Life Ins. Co.,* 481 U.S. at 48, 107 S.Ct. 1549)). "In short, when beneficiaries seek to recover benefits from a plan covered by ERISA, their exclusive remedy is provided by ERISA, in 29 U.S.C. § 1132(a)(1)(B)." *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 979 (5th Cir.1991).

■ Accordingly, the Fifth Circuit has found claims brought under Texas law asserting a variety of common law and statutory causes of action arising from the failure to pay or misrepresentations concerning benefits available under an ERISA plan to be preempted by ERISA—breach of contract, negligence, fraud, negligent misrepresentation, breach of fiduciary duty, breach of the duty of good faith and fair dealing, equitable estoppel, intentional infliction of emotional distress, violation of the Texas Deceptive Trade Practices Act, and violation of Article 21.21 of the Texas Insurance Code. *See Hogan v. Kraft Foods,* 969 F.2d 142, 144 (5th Cir.1992); *Hermann Hosp. v. MEBA Med. & Benefits Plan ("Hermann II "),* 959 F.2d 569, 577–78 (5th Cir.1992); *Hansen,* 940 F.2d at 979; *Ramirez v. Inter-Continental Hotels,* 890 F.2d 760, 763–64 (5th Cir.1989); *Boren v. NL Indus., Inc.,* 889 F.2d 1463, 1465–66 (5th Cir.1989), *cert. denied,* 497 U.S. 1029, 110 S.Ct. 3283, 111 L.Ed.2d 792 (1990). In addition, claims brought under Article 21.55 of the Texas Insurance Code have been found to be preempted by ERISA. *See Frank C.*

*Gaides, Inc. v. Provident Life & Accident,* No. CV–95–1273 (CPS), 1996 WL 497085, at *7–8 (E.D.N.Y. Aug. 26, 1996). Preemption applies when the essence of a claim seeks the recovery of benefits or otherwise relates to an employee benefit plan, even when brought against a third-party, non-fiduciary. *See Hubbard,* 42 F.3d at 946; *Corcoran,* 965 F.2d at 1334; *Consolidated Beef Indus., Inc. v. New York Life Ins. Co.,* 949 F.2d 960, 964 (8th Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992); *Gibson v. Prudential Ins. Co. of Am.,* 915 F.2d 414, 418 (9th Cir.1990); *Howard v. Parisian, Inc.,* 807 F.2d 1560, 1564 (11th Cir.1987).

■ Here, Salameh has brought suit against Provident, an insurer, alleging that he was wrongfully denied benefits under a disability income insurance policy. This action, therefore, directly affects the relationship between traditional ERISA entities—a beneficiary and a fiduciary. Moreover, Salameh's claims address his right to receive benefits under the terms of an ERISA plan. Accordingly, Salameh's action to recover benefits from the fiduciary of a covered plan falls directly within the civil enforcement provision of ERISA, which provides an exclusive federal cause of action for the resolution of such disputes. Because the essence of his suit seeks the recovery of benefits or otherwise relates to an employee benefit plan, his state law claims brought under the Texas Insurance Code are preempted by ERISA. Salameh may proceed, however, on his claim for policy benefits under ERISA. *See* 29 U.S.C. § 1132(a)(1)(B).

### D. *Availability of Jury Trial*

Although Salameh has filed a jury demand, Provident contends that because he is limited to proceeding under ERISA, he has no right to a jury trial.

"ERISA does not specify whether a jury should decide claims brought under 29 U.S.C. § 1132(a)(1)(B)." *Adams v. Cyprus Amax Minerals Co.,* 149 F.3d 1156, 1158, 1998 WL 396565 (10th Cir.1998) (citing *Zimmerman v. Sloss Equip., Inc.,* 72 F.3d 822, 829 (10th Cir.1995)). "The legislative history also provides no guidance on this issue." *Id.* (citing *Zimmerman,* 72 F.3d at 829 n. 3).

" " 'Congress expressed no opinion on the mode of trial intended for plan-enforcement actions.' " " *Id.* (quoting *Zimmerman,* 72 F.3d at 829 n. 3 (quoting *Note, The Right to Jury Trial in Enforcement Actions under Section 502(a)(1)(B) of ERISA,* 96 HARV. L. REV. 737, 738, 741–43 (1983))). There being no express statutory right to a jury trial and no indication of congressional intent to grant such a right, any entitlement to a jury trial must arise from the Seventh Amendment. *See id.* (citing *Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, ——, 118 S.Ct. 1279, 1283–84, 140 L.Ed.2d 438 (1998)).

"[T]he Seventh Amendment applies to " 'actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty.' " " *Id.* (quoting *Feltner,* 523 U.S. at ——, 118 S.Ct. at 1284 (quoting *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989))). To determine whether a particular action will resolve legal rights, a court examines both the nature of the issues involved and the remedy sought. *See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 565, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990); *Adams,* 149 F.3d 1156, 1158, 1998 WL 396565; *Borst v. Chevron Corp.,* 36 F.3d 1308, 1323 (5th Cir.1994), *cert. denied,* 514 U.S. 1066, 115 S.Ct. 1699, 131 L.Ed.2d 561 (1995). "This analysis consists of two inquiries: (1) a comparison of the present statutory action to 18th-century actions in the courts of England before the merger of the courts of law and equity; and (2) an examination of the relief sought to determine whether it is legal or equitable in nature." *Id.* (citing *Terry,* 494 U.S. at 565, 110 S.Ct. 1339); *see Adams,* 149 F.3d 1156, 1159, 1998 WL 396565. "Of the two, the latter inquiry bears more weight." *Borst,* 36 F.3d at 1324. Because " 'cases involving ERISA benefits are inherently equitable in nature, not contractual, ... no right to jury trial attaches to such claims.' " *Tischmann v. ITT/Sheraton Corp.,* 145 F.3d 561, 568 (2d Cir.1998) (quoting *DeFelice v. American Int'l Life Assurance Co. of N.Y.,* 112 F.3d 61, 64 (2d Cir.1997)); *see Adams,* 149 F.3d 1156, 1160–1163, 1998 WL 396565; *Broaddus v.*

*Florida Power Corp.,* 145 F.3d 1283, 1287 n. 1 (11th Cir.1998); *Borst,* 36 F.3d at 1324.

The Fifth Circuit has held, "as have the majority of other circuits, that ERISA claims do not entitle a plaintiff to a jury trial." *Borst,* 36 F.3d at 1324 (citing *Calamia v. Spivey,* 632 F.2d 1235, 1237 (5th Cir.1980); *Kirk v. Provident Life & Accident Ins. Co.,* 942 F.2d 504, 506 (8th Cir.1991); *Blake v. Unionmutual Stock Life Ins. Co.,* 906 F.2d 1525, 1526 (11th Cir.1990)); *see Adams,* 149 F.3d 1156, 1162, 1998 WL 396565; *Broaddus,* 145 F.3d at 1287; *Tischmann,* 145 F.3d at 568; *DeFelice,* 112 F.3d at 64–65; *Houghton v. SIPCO, Inc.,* 38 F.3d 953, 957 (8th Cir.1994); *Bair v. General Motors Corp.,* 895 F.2d 1094, 1097 (6th Cir. 1990); *Cox v. Keystone Carbon Co.,* 894 F.2d 647, 649–50 (3d Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990). The Fifth Circuit reasoned in *Borst* that "ERISA law is closely analogous to the law of trusts, an area within the exclusive jurisdiction of the courts of equity." 36 F.3d at 1325 (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). "ERISA abounds with the language and terminology of trust law. ERISA's legislative history confirms that the Act's fiduciary responsibility provisions, 'codif[y] and make[ ] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts.' " *Bruch,* 489 U.S. at 110, 109 S.Ct. 948 (citing H.R.Rep. No. 93–533, p. 11 (1973)). Thus, because Salameh's action is equitable in nature, rather than legal, the Seventh Amendment provides no right to a jury trial. *See Adams,* 149 F.3d 1156, 1162, 1998 WL 396565; *Broaddus,* 145 F.3d at 1287; *Tischmann,* 145 F.3d at 568; *Borst,* 36 F.3d at 1324. Therefore, Salameh's demand for jury trial must be rejected.

### III. *Conclusion*

When Salameh was injured on June 5, 1993, his disability income insurance policy was part of an employee benefit plan covered by ERISA. Although he is a partner in Urology Associates, Salameh has standing to sue as a beneficiary under ERISA. Consequently, Salameh's causes of action under

Texas law are preempted by ERISA. His exclusive remedy lies under the civil enforcement provision of ERISA, 29 U.S.C. § 1132(a)(1)(B). Because his remedy under ERISA is equitable in nature, Salameh is not entitled to a jury trial.

Accordingly, Defendant's Motion to Dismiss Plaintiff's State Law Claims and to Strike Plaintiff's Jury Demand due to ERISA Preemption is GRANTED, and Plaintiff's Demand for Jury Trial is DENIED.

IT IS SO ORDERED.